## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CARL DUNST and JAMEY SMITH, individuals, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   vs.<br><br>CAMPBELL SOUP COMPANY, a New Jersey Corporation; and SNYDER'S-LANCE, INC., a North Carolina corporation,<br><br>      Defendants. | Case No. 1:24-CV-568<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT FOR:**<br><br>**1.  Failure to Pay Minimum Wage under the FLSA (29 U.S.C. § 206(a)(1)(C))**<br>**2.  Failure to Pay Overtime under the FLSA (29 U.S.C. § 207(a)(1))**<br>**3.  Violation of the NCWHA (N.C. Gen Stat. §§ 95-25.1, *et seq.*)**<br>**4.  Unfair and Deceptive Trade Practices (N.C. Gen. Stat. § 75-1.1)** |

## JURY TRIAL DEMANDED

Plaintiffs Carl Dunst ("Dunst") and Jamey Smith ("Smith") (collectively, "Plaintiffs") file this Class and Collective Action Complaint against Defendants Campbell Soup Company and Snyder's-Lance, Inc. (collectively, "Defendants" or "Campbell Snacks"), seeking all available relief under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95.21.1, *et. seq.*, on behalf of themselves and all current and former Distributors[1] who work (or worked) for Defendants during the relevant time period. The following allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to the acts of others.

---

[1] "Distributors" are Campbell Snacks' direct-store-delivery workers who enter Distributor Agreements with Campbell Snacks and are classified by Campbell Snacks as independent contractors.

Case 1:24-cv-00568-LCB-JLW   Document 1   Filed 07/10/24   Page 1 of 36

## NATURE OF ACTION

1.      Defendant Campbell is a brand powerhouse with two divisions: Meals & Beverages and Snacks. Within its Snacks segment is Defendant Snyder's-Lance, which it acquired in 2018 and has owned and controlled since. Synder's-Lance and other brands make up Campbell's Snack division. Collectively, Defendants are one of the largest producers and distributors of snack foods in the United States.

2.      Campbell Snacks deploys an elaborate independent misclassification scheme to cheat its employees, its competition, and the state and federal governments. Campbell Snacks does so by willfully and systematically misclassifying its hundreds of delivery drivers as "Independent Contractors" (sometimes referred to as "Distributors" throughout). In doing so, Campbell Snacks denies these Distributors, including the named Plaintiffs, access to critical benefits and protections they are entitled to by law, such as minimum wage, overtime compensation, and indemnification for business expenses/deductions. Through its willful misclassification, Campbell Snacks also robs the federal and state governments of tax revenue, causes losses to state unemployment insurance and workers' compensation funds, and gets an undue advantage over its law-abiding competition.[2]

3.      Campbell Snacks sells billions of dollars of snack food products to retailers throughout the United States. To help sustain its profits, Campbell Snacks has concocted a model where it advertises "independent contractor" distributor opportunities. As part of the model, Campbell Snacks requires each Distributor to purchase a specific sales territory in

---

[2] *See* U.S. Dept. of Labor, Wage and Hour Division, "Misclassification of Employees as Independent Contractors," available at https://www.dol.gov/whd/workers/Misclassification/ (describing the repercussions of misclassification) (last accessed June 10, 2024).

which the Distributor is supposedly going to purchase, take title to, re-sell, and distribute Campbell Snacks' snack food products to customers who are prearranged for the Distributor by Campbell Snacks. The Distributors pay large sums for the right to the "independent distributor" opportunity outlined in Campbell Snacks' advertisements and its Distributor Agreement ("DA").

4.     In short, Campbell Snacks sells the notion that these "independent contractors" will run and control their own sales-based business with their own customers for their own profit and gain. But Campbell Snacks never actually operates its business under these terms, despite Distributors' heavy investment and reliance on the promises Campbell Snacks makes.

5.     In reality, the distributor role is far from "independent." For example, for the vast majority of product sales, Campbell Snacks itself contracts directly with its own large retailer customers (like Walmart, Target, and large convenience-store chains) and maintains title over the snack food products until the retailers take possession.[3] But in no case do Distributors ever actually receive title to products that go into Campbell Snacks' retail locations. Instead, Campbell Snacks provides its product to Distributors on "consignment." Distributors merely deliver the product and stock Distributors' customers' shelves for a non-negotiable commission that Campbell Snacks unilaterally establishes.

---

[3] As described in Campbell Snacks' Distributor Agreements, "the Products shall be delivered on consignment to Distributor by Snyder's-Lance on the terms and at the prices established, in writing, by Snyder's-Lance from time to time." Accordingly, Snyder's-Lance retains legal ownership of the products as the "consignor," whereas Distributors take no title to the products and receive a simple commission for their product deliveries as "consignees."

CLASS ACTION COMPLAINT

6.     Campbell Snacks also dictates the set route or territory that Distributors deliver within. Campbell Snacks maintains control over that territory or route with respect to things like which Campbell Snacks' products will be available, price, shelf space, displays, and promotion. Worse still, Campbell Snacks determines which products Distributors may deliver (for which Distributors receive commission) and which products Campbell Snacks will directly ship to retailers from its warehouse (for which Distributors receive no commission). Often, the sole difference between the products carried by Distributors and those directly shipped by Campbell Snacks is the amount of wholesale product in the container (*e.g.*, Distributors carry a brand of crackers that comes in a container of twenty packages, while Campbell Snacks directly ships the same brand of crackers but in containers of six packages).

7.     Campbell Snacks also unilaterally dictates when unsold snack food products must be reclaimed from retail locations (a.k.a. "stales" or stale product) as dictated by its retail customers and passed down to Distributors.

8.     Campbell Snacks also dictates which products and brands of goods will be sold within each territory. Notably, Campbell Snacks may, and does, elect to change which retailers it serves and/or which brands it will carry. This is true even where Campbell Snacks drastically devalues the Distributors' routes because Campbell Snacks unilaterally chooses to discontinue a certain brand or stop selling to a particular retailer within that route.

9.     Campbell Snacks also hires management and sales employees at each of its regions to carry out sales and to directly supervise and instruct the so-called "independent

4
CLASS ACTION COMPLAINT

distributors" in performance of their distribution and merchandizing responsibilities within their routes.

10.     As such, rather than operating the sales-oriented independent business promised to them, Distributors primarily carry out a vital portion of Campbell Snacks' direct-store-delivery ("DSD") business operations—delivering and merchandizing bakery products to Campbell Snacks' retail customers for a set commission.

11.     Plaintiffs are Distributors who entered into the DA with Campbell Snacks. Plaintiffs bring this action on behalf of themselves and other similarly situated Distributors. This hybrid action is brought both as a "collective" action under the Federal Labor Standards Act ("FLSA") as well as a class action under Rule 23 of the Federal Rules of Civil Procedure based on numerous violations of North Carolina law.

## THE PARTIES

12.     Plaintiff Carl Dunst is an adult individual who, at all relevant times when he personally performed work as a Distributor for Campbell Snacks was a resident of the state of North Carolina. Plaintiff served as a "Distributor" from approximately 2015 through present.

13.     Plaintiff Dunst is a covered employee within the meaning of the FLSA and NCWHA.

14.     Plaintiff Dunst's written Consent to Join form is attached hereto as **Exhibit A**.

15.     Plaintiff Jamey Smith is an adult individual who, at all relevant times when he personally performed work as a Distributor for Campbell Snacks was a resident of the

state of North Carolina. Plaintiff served as a "Distributor" from approximately 2012 to present.

16.     Plaintiff Smith is a covered employee within the meaning of the FLSA and NCWHA.

17.     Plaintiff Smith's written Consent to Join form is attached hereto as **Exhibit B**.

18.     Defendant Campbell Soup Company is a New Jersey corporation with a principal business address at One Campbell Place, Camden, NJ 08103. On March 26, 2018, Campbell's announced that it completed the acquisition of Snyder's-Lance. Snyder's-Lance is a major part of its Snacks division.

19.     Defendant Snyder's-Lance, Inc., is a North Carolina corporation with a principal business address at One Campbell Place, Camden, NJ 08103. Synder's-Lance is the surviving company that merged with S-L Distribution, LLC, which is the entity to actually sign and enter the relevant independent contractor agreements with Plaintiffs and the putative class.

## JURISDICTION

20.     This Court has original subject-matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

21.     In addition, the court has supplemental jurisdiction over Plaintiffs' state-law class claims pursuant to 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Defendants because they do business in North Carolina and in this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff Smith resides in this District, has distributed Defendants' snack products in this District, and because other substantial events giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### A.     Defendants' Direct-Store-Delivery Business Model

24.     Defendants use a "direct-store-delivery" ("DSD") model to deliver household brand snack products into large retail stores like Walmart and Target. An integral part of this DSD model involves Distributors like Plaintiffs who pick up the snack food product at local warehouses and deliver them to the retail customers' shelves (*e.g.*, the store delivery aspect of Defendants' DSD model).

25.     Campbell is a "focused brand powerhouse with two divisions: Meal & Beverages and Snacks." *See* https://www.campbellsoupcompany.com/about-us/. Part of Campbell's Snacks segment is the portfolio of Defendant Snyder's-Lance, which was acquired by Campbell on March 26, 2018. *See* https://www.campbellsoupcompany.com/newsroom/press-releases/campbell-completes-acquisition-of-snyders-lance/. Snacking represents approximately 47% of Campbell's $10.1 billion in annual net sales, approximately $4.7 billion. *See* CAMPBELL SOUP COMPANY, FORM 8-K, EXHIBIT 99.1, at 3, March 26, 2018.

26.     Campbell's wholly owned Snyder's-Lance "is a whole distributor of various snack food products manufactured by subsidiaries and affiliates" of Campbell. *See*

https://www.snyderslanceibo.com/ (last viewed June 19, 2024). Further, Snyder's-Lance "also provides wholesale distribution services to a variety of unrelated snack food companies known as Partner Brands[.]" *Id.* These "Partner Brands" are typically Campbell products other than Snyder's.

27. Campbell and Snyder's-Lance share managerial employees. For instance, Campbell's Vice President of Logistics, Brian Dubak, is also an authorized representative for Snyder's-Lance.

28. Snyder's-Lance operates throughout the United States and internationally. https://www.campbellsoupcompany.com/newsroom/news/campbell-to-acquire-snyders-lance-inc-to-expand-in-faster-growing-snacking-category/. Its portfolio of product brands includes Snyder's of Hanover®, Lance®, Kettle Brand®, KETTLE® Chips, Cape Cod®, Snack Factory® Pretzel Crisps®, Pop Secret®, Emerald®, Late July®, Krunchers!®, Tom's®, Archway®, Jays®, Stella D'oro®, Eatsmart Snacks™, O-Ke-Doke®, Metcalfe's Skinny®, and other brand names along with a number of third-party brands. *Id.*

29. On August 30, 2018, Campbell announced its vision to be a leading snacks company. To support this strategy, Campbell focused on the integration of Snyder's-Lance into Campbell's business operations. CAMPBELL SOUP COMPANY, FORM 10-K, September 27, 2018. This integration included the sharing of key learnings and best practices between Campbell and Snyder's-Lance, including integrating Snyder's-Lance supply chain and distributor model. CAMPBELL SOUP COMPANY, FORM 8-K, EXHIBIT 99.1, March 26, 2018. Accordingly, Campbell engaged Snyder's-Lance distributors to distribute its snack products. Furthermore, Campbell engages in the routine purchase and sale of Snyder's-

Lance distributor routes in order to maintain and expand upon this DSD model. CAMPBELL SOUP COMPANY, FORM 10-K, September 24, 2020. Campbell also frequently makes large capital expenditures to optimize its DSD distribution model.

30. Thus, in order to get valuable snack product to market, Defendants utilize the labor of Distributors, who transport Defendants' goods from Defendants' local warehouses to Defendants' retail customer shelves.

31. Needing to satisfy their customers and to provide the services they want, Defendants exercise pervasive control over their Distributor workforce. For example, Defendants establish the terms and prices for the snack-food products, delivery windows and schedules, product inspection requirements, and Operating Guidelines[4] which regulate Distributor conduct.

### B.    Defendants Misclassified Drivers

32. Integral to Defendants' snack food empire, Defendants use the labor of Distributors, like Plaintiffs and the Class he seeks to represent, to carry out snack-food delivery services for Defendant's third-party retail customers that include major grocery chains and convenience stores. Defendants label Distributors as "independent contractors." In short, these Distributors perform a central part of Defendants' snack-distribution business: the picking-up, carrying, and delivery of snack-food products to Defendants'

---

[4] Campbell Snacks issues to its Distributors a document entitled "Suggested Operating Guidelines & Schedule of Charges." Campbell Snacks states the Suggested Operating Guidelines set forth: "(1) suggested guidance and observed best practices of other successful distributors which can be used by Distributor, at its discretion, in operating its business and executing sales and distribution to its customers in the Territory; (2) an overview of settlement and damaged product return procedures; (3) an overview of various charges that may be applicable from time to time as a result of Distributor's requests or interactions with Snyder's-Lance, Inc. ("Snyder's-Lance") and other miscellaneous information that Distributor may find useful."

CLASS ACTION COMPLAINT

customers. The work of Distributors is necessary to Defendants' snack-distribution business and is continuously performed for Defendants. Further, Snyder's-Lance holds itself out as a wholesale snack-foods distribution company. Distributors are naturally an essential component of Defendants' business model.

33.     Defendants strictly control and regulate Distributors. Defendants agree to allocate responsibility for, or otherwise codetermine, the essential terms and conditions of Distributors' employment. Distributors must follow the terms of Defendants' onerous Distributor Agreement, along with other written instructions from Defendants. Under these operating requirements and standards, Defendants exert control and direction on Distributors in connection with the performance of their distribution services, both in contract and in fact. This control and direction includes, but is not limited to, the following:

    a.     Defendants issue to Distributors Suggested Operating Guidelines & Schedule of Charges which Distributors must acknowledge in writing. Therein, Defendants regulate Distributors' conduct, including detailing how Distributors must interact with customers, how Distributors must interact with Defendants, and the various charges Defendants may issue Distributors for their services.

    b.     Defendants deliver to Distributors on consignment snack food products under terms and prices that it unilaterally establishes. Defendants retain sole authority to modify these terms and prices at their discretion. Defendants may also negotiate a price for the snack-

food product with their customers directly which Distributors must honor.

c.     Defendant unilaterally establishes the commission paid to Distributors for their services. Distributors are paid a single "blended" commission for all deliveries, regardless of product type and price.

d.     Defendants establish the procedures by which Distributors must abide to place orders for snack-food products on consignment from Defendants.

e.     Defendants establish the locations from which Distributors must pick up the snack-food products.

f.     Defendants establish the process by which Distributors must report missing or damaged products. Distributors must cooperate and provide support to Defendants in the investigation of any claim that a delivery by Defendants contains damaged or missing products.

g.     Defendants have the right to inspect products which have already been consigned to Distributors. Defendants may take possession of products consigned to Distributors upon 48 hours prior notice.

h.     Distributors must report their inventory to Defendants at least once a week, but in no case later than the deadline established by Defendants. Should a Distributor fail to make this weekly report as requested by Defendants, the Distributor may be charged for that week's shipment of products to the Distributor.

i.      Distributors must support and cooperate with Defendants in the case of a product recall.

j.      Distributors hold and care for the snack food products as the sole and exclusive property of Defendants, but take no title to the products. Distributors must store the products in such a manner as to protect them. However, upon delivery to a Distributor, the Distributor assumes the risk of loss, theft, or damage to the products.[5]

k.      Distributors must hold and care for the products of other Distributors in accordance with the Distributor Agreement.

l.      Distributors are obligated to use their "best efforts" to: (1) develop the full sales potential of the territory; (2) sell products to stores and retail outlets within the territory in accordance with the Distributor Agreement; (3) sell and promote the products to achieve the best result possible; (4) provide service to Defendants' customers in accordance with good industry practice and as requested Defendants' customers; and (5) maintain the established reputation and good will of the products in the marketplace.

m.      Distributors must comply with any policies, procedures, requests, and requirements imposed upon them by Defendants' customers. A

---

[5] This is, in essence, Campbell Snacks' consignment scheme, as described in Section C, *supra*. Campbell Snacks' Distributor Agreement explicitly states that the products remain Campbell Snacks' property, but offsets the risk of loss, theft, or damage to Distributors.

Distributor wishing to change his or her delivery schedule must provide Defendants with at least fifteen days written notice.

n.    Defendants enter into contracts with retailers in order to stock their shelves with Defendants' products. When these contracts expire, only Defendants' representatives can negotiate and renew the contracts. If Defendant does not desire and/or act to renew the contract, the retail outlet is removed from the respective Distributor's territory.

o.    Defendants determine the amount of product retail stores must have in stock. Failure to meet Defendants' standards results in discipline to the Distributor. For some of their more valuable customers, Defendants require multiple weeks of product in-stock at all times, which requires Distributors to disproportionately service those stores or risk termination.

p.    On occasion, Defendants' representatives ride along with Distributors as they service their respective territories in order to monitor Distributor performance and check-in on the retail outlets. This is known as a "market check."

q.    Defendants determine which products Distributors may carry, and which products they may not.

r.    Defendants determine the amount of shelf space devoted to products carried by Distributors. It may choose to promote Distributor-carried

brands by increasing shelf space, or suppress Distributor-carried brands by reducing shelf space for those products.

s.   Defendants determine which products it will directly ship to retail outlets at the exclusion of Distributors, and which products Distributors may deliver and receive commission.

t.   Defendants determine whether the products carried by Distributors will be subject to promotions.

u.   Defendants maintain a record of the products carried by each Distributor. Should a Distributor's records show less product carried than Defendants' records, Defendants will place the extra product "in dispute." Unless the Distributor shows Defendants proof of the product, Defendants will require the Distributor to pay them the amount of the extra product.

v.   Distributors may procure product only from Defendants unless Distributors produce to Defendants a receipt from where they procured their product. Should a Distributor not produce such a receipt, the product will be placed in "Inventory Reconciliation" and the Distributor will be unable to distribute the product.

w.   Defendants regulate the individuals whom Distributors hire to aid them in servicing the respective territories.

x.   Defendants require that Distributors incorporate, register, and license their franchises. Distributors are obligated to maintain their franchises

for the duration of the Distributor Agreement. Distributors must also acquire and maintain an employer identification number and provide proof thereof to Defendants.

y.      Distributors must acquire and maintain all licenses and permits needed for conducting business, operating their vehicles, and performing under the Distributor Agreement. Distributors must provide proof of all such licenses and permits to Defendants.

z.      Distributors must electronically transmit records of their deliveries and any other transactions to Defendants in the specific format required by Defendants. If Distributors wish to use a hand-held computer system provided by Defendants to make this transmission, they must do so pursuant to the terms and conditions established by Defendants.

aa.     Distributors must keep accurate records of the products they receive, and sales and deliveries made (and other operations). Defendants may inspect such records two times per year, or more in exceptional circumstances.

bb.     Distributors have five days to remedy any failure to meet the service requirements of Defendants' customers. If such failure is not remedied within five days, Defendants may deem the territory abandoned. Where a territory is abandoned, all rights under the Distributor Agreement revert to Defendants.

15
CLASS ACTION COMPLAINT

34. Defendants have the right to terminate the Distributor Agreement and a Distributor's rights with respect to the territory, upon 24 hours written notice, with no right to cure, after occurrence of any of the following:

a. Insolvency of the Distributor;

b. Dishonesty, fraudulent conduct, or misrepresentation by the Distributor;

c. Performance of the Distributor's duties while under the influence of alcohol or illegal drugs;

d. Involvement in any activity which is unsafe or is a health hazard to the public;

e. Conviction of the Distributor or any of his/her directors or officers of any offense which is punishable by imprisonment or which is a felony;

f. Any actions by the Distributor which cause, or Defendants believe are likely to cause substantial harm to (1) Defendants' business, goodwill or reputation in the territory or elsewhere; (2) the Distributor's business, goodwill or reputation; or (3) another Distributor's business, goodwill or reputation;

g. Abandonment of the territory or a customer within the territory; and

h. The failure to submit accurate and timely inventory reports.

35. In the case of any other breach of the Distributor Agreement, Distributors have five days to cure such breach after which Defendants may terminate at their discretion.

CLASS ACTION COMPLAINT

36.     Defendants are not obligated to afford Distributors the right to cure a breach on more than three occasions during any consecutive 12-month period. Should a subsequent breach occur, Defendants may terminate the Distributor Agreement upon 24 hours' written notice without the right to cure.

37.     Defendants further have the right to terminate the Distributor Agreement and Distributors' rights thereunder for any undefined "just cause" that may arise upon giving sixty days prior written notice.

**C.     Defendants Deprive Distributors of Contractually Owed Wages**

38.     In order to purchase a distribution territory, a Distributor must enter into a Distribution Agreement with Defendants. The Distribution Agreement includes a boundary description and map of the Distributor's territory, as well as a list of retail outlets in their territory.

39.     Defendants issue product to Distributors on "consignment." When Distributors transport and stock retail outlets with the consigned product, Defendants pay Distributors a commission set by Defendants. This commission is the sole form of wages received by Distributors for their services to Defendants. Defendants may, and do, unilaterally change the commission received by Distributors.

40.     Defendants' current policy of issuing product on consignment is distinct from Defendants' prior distribution practices examined in *Mode v. S-L Dist. Co., LLC*, No. 3:18-cv-00150-RJC-DSC, 2019 WL 1057045 (W.D.N.C. Mar. 6, 2019). In *Mode*, the plaintiff "would purchase the products at wholesale from S-L and then sell the products to various stores at a higher price." *Id.* at *2. The court ultimately found that "when a plaintiff

purchases goods from a defendant and earns income by selling those goods to third-party retailers at a higher price, the profits earned on that sale fall outside of the NCWHA's definition of 'wages.'" *Id.* at \*3 (citing *Troche v. Bimbo Foods Bakeries Distribution, Inc.*, No. 3:11–cv–234–RJC–DSC, 2015 WL 4920280, at \*7 (W.D.N.C. Aug. 18, 2015)).

41. Defendants have now moved to a full consignment model. Distributors never take title of the product; it remains Defendants' product at all times. Distributors do not purchase product from Defendants, nor sell product to third party retailers for a profit. Instead, Distributors are issued product by Defendants and deliver that product to Defendants' retail outlet customers on terms set by Defendants. Defendants establish a non-negotiable commission rate for Distributors, which Distributors receive for distributing the consigned product to retail outlets. The commission Distributors receive for distributing Defendants' product is a "wage," pursuant to N.C. Gen. Stat. § 95-25. 2(16).

42. Accordingly, through the Distribution Agreement, Distributors are contractually owed the commission on products distributed to retail outlets within their territory. Yet, Defendants routinely deprive Distributors of these wages.

43. Defendants authorize which product stock keeping units (SKUs) Distributors may distribute to retail outlets. The SKU is determined by the type of product and volume of packaging.

44. Defendants may, and do, directly ship product to retail outlets in Distributors' territories thereby bypassing the Distributor's role in getting the product to market. Direct shipping involves Defendants sending product directly from their warehouse to the retail

Case 1:24-cv-00568-LCB-JLW   Document 1   Filed 07/10/24   Page 18 of 36

outlet, cutting the Distributor out of the process. When Defendants direct-ship a product with an SKU carried by Distributors, Defendants pay Distributors a reduced commission rate. However, when Defendants direct-ship a product with an SKU that is not carried by Distributors, Defendants pay Distributors no commission.

45.     Defendants arbitrarily and nominally change product SKUs so that they may direct ship the product without paying Distributors their commission. For example, Defendants will authorize Distributors to carry an SKU of cracker snacks that come in a container of twenty individually wrapped packages. Defendants will then generate a new SKU for the same cracker products that contains six individually wrapped packages. Similarly for bagged chips, Distributors will be authorized to carry 5.5 oz bags. Defendants then generate a new SKU of the same chips which come in 5 oz bags. Defendants will not authorize Distributors to carry this new SKU, and Defendants pay Distributors no commission on these direct shipments even though the same retail outlets are buying the same product, just packaged in a different quantity. Because the product is placed on the retail outlet shelves in their individual packaging, there is no discernible difference between the product carried by Distributors and the product directly shipped by Defendants apart from differing bar codes on the back of the product. The below photos depict product carried by Distributors and product directly shipped by Defendants. The products are indistinguishable. Yet, Distributors receive commission on some of these products and, by Defendants' whim, not on others. By arbitrarily creating new product SKUs so that Defendants may direct-ship product to retail outlets in Distributors' territories without

paying Distributors their commission, Defendants deprive Distributors of their contractually owed wages.

 

CLASS ACTION COMPLAINT





 

46.    Furthermore, territory valuation is based upon Distributors' weekly average of product distributed to retail outlets in their respective territories. Product directly shipped by Defendants does not factor into this average. A drop in number of products distributed by the Distributor corresponds with a drop in route valuation. By direct-shipping product to retail outlets that would otherwise be delivered by Distributors, Defendants harm the valuation of Distributors' territories and cost them commissions.

47.    Defendants also unilaterally remove retail outlets from within Distributors' territories. For instance, Defendants will end all DSD operations for a retail outlet and replace it solely with direct shipping. Defendants have done this for some of their largest

retail customers like Walmart, leaving a devastating impact on Distributors' commissions and route valuations. Distributors receive no corresponding payment for the loss of the retail outlet.

48.     Defendants' actions, as described above, result in Distributors being deprived of the contractually owed wages under their Distributor Agreement with Defendants.

**D.      Defendants' Unlawful Deductions and Failure to Reimburse Business Expenses**

49.     Distributors pay for the right to work for Defendants. This includes, but is not limited to, paying a non-refundable "initial fee" to purchase a distribution territory, paying a weekly administrative service charge, paying a daily charge for temporary route service by Defendants, paying for manual invoice entries by Defendants, paying for sales ticket errors, paying a central-billed account fee for missing invoices, and paying a returned check fee. On occasion, Defendants weekly payments to its Distributors will show a negative amount owed to Distributors, meaning the Distributor actually owes Snyder's money as a result of the Distributor's operations that pay period.

50.     Distributors also shoulder many other unreimbursed business expenses for Defendants, including but not limited to vehicle related expenses like fuel/mileage, clothing and uniforms, the computer system required to make mandatory electronic transmissions to Defendants of transactions, and insurance. Defendants are well aware of these expenses and they are reasonably necessary. Upon information and belief, Defendants failure to reimburse Distributors for these purchases made primarily for the

Case 1:24-cv-00568-LCB-JLW   Document 1   Filed 07/10/24   Page 23 of 36

benefit of Defendants results in Distributors receiving wages that are below the minimum required by the FLSA and NCWHA.

**E.     Defendants' Failure to Comply with Other North Carolina Wage and Hour Laws**

51.     As explained further below, as a result of their unlawful misclassification, Defendants fail to provide Distributors with a minimum wage for all hours worked, fails to provide overtime pay, fails to provide lawful notice in changes to compensation, and fails to maintain accurate records in violation of North Carolina law.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

52.     Plaintiffs bring the First and Second Counts below as a collective action under the FLSA on behalf of themselves and all similarly situated individuals. The proposed FLSA Collective Class ("FLSA Class") is defined as:

> All persons who personally worked pursuant to a "Distributor Agreement" or similarly styled hiring agreement to distribute Defendants' snack food products to their customers that were not classified as employees during the period commending three years prior to the commencement of this action through the close of the Court-determined opt-in period.

Plaintiffs reserve the right to modify the definition prior to conditional certification of the FLSA Collective Action.

53.     To the extent tolling operates to toll claims by the FLSA Class against Defendants, the applicable statute of limitations and period for calculating damages should be adjusted accordingly.

54.     Defendants are engaged in communication, business, and transmission throughout the United States and are, therefore, engaged in commerce within the meaning of Title 29 of the United States Code Section 203(b).

55.     Plaintiffs have consented in writing to be a part of this action pursuant to Title 29 of the United States Code Section 216(b).

56.     Plaintiffs and members of the FLSA Class are similarly situated in that they signed a DA or similar contract, have substantially similar job requirements, receive similar or identical pay, and were required to work under the same uniform conditions and systems.

57.     This action meets all prerequisites for the maintenance of a collective action under the FLSA. Also, the persons who comprise the FLSA Class exceed 100 persons and are therefore so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a collective class will benefit the parties and the Court.

58.     Nearly all factual, legal, statutory, declaratory, and injunctive relief issues raised in this Complaint are common to the FLSA Class and will apply uniformly to every member of the FLSA Class.

59.     The representative Plaintiffs will fairly and adequately represent and protect the interest of the FLSA Class, and have retained attorneys who are competent and experienced in similar litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the FLSA Class that would make collective treatment inappropriate. Counsel for the FLSA Class will vigorously assert the claims of the entire FLSA Class.

60.     Notice of this lawsuit should be sent to the FLSA Class and Plaintiffs will move for this after filing this Complaint. These individuals are readily identifiable through Campbell Snacks' records.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring the Third and Fourth Counts below as a class action against Campbell Snacks pursuant to Rule 23 of the Federal Rules of Civil Procedure and pursuant to Campbell Snacks' many violations of North Carolina state law. The proposed Rule 23 Class ("North Carolina Class") is defined as:

> All individuals who personally worked in North Carolina during the Class Period pursuant to a "Distributor Agreement" or similarly styled hiring agreement to distribute Defendants' snack products to their customers that were not classified as employees during the period commencing three years prior to the commencement of this action through judgment.

Plaintiffs reserve the right to amend the above Class and to add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability, among other reasons.

62.     **Numerosity.** The potential members of the Class as defined are so numerous that joinder of all the members is impracticable.  While the precise number of class members has not been determined, Plaintiffs are informed and thereon believe that there are more than 300 individuals meeting the class definition.  Defendant has access to data necessary to identify the members of the Class.

63.     **Adequacy of Representation.** The named Plaintiffs are fully prepared to take all necessary steps to fairly and adequately represent the interests of the Class defined

above. Plaintiffs' attorneys are ready, willing, and able to fully and adequately represent the Class and individual Plaintiffs. Plaintiffs' attorneys are highly experienced in employment class action litigation. Plaintiffs intend to prosecute this action vigorously.

64. **Common Questions of Law and Fact.** There are predominant common questions and answers of law and fact and a community of interest amongst Plaintiffs and the claims of the Class as follows:

    a. The proper interpretation of the DA;

    b. Whether Plaintiffs and the members of the Class were misclassified as independent contractors under North Carolina law;

    c. Whether Defendants' misclassification of Plaintiffs and the Class as independent contractors was willful and/or intentional;

    d. Whether Plaintiffs and other Distributors worked overtime without receiving overtime wages; and

    e. Whether deducting wages for various expenses from Plaintiffs and the members of the Class's pay for ordinary business expenses was illegal.

65. **Typicality.** The claims of Plaintiffs are typical of the claims of all members of the Class because Defendants applied and continues to apply their illegal pay practices uniformly to all employees.

66. **Superiority of a Class Action.** Class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all members of the Class is not practicable, and questions of law and fact common to the Class

predominate over questions affecting only individual Class members. Each Class member has been damaged and is entitled to recovery due to Defendant's conduct described in this Complaint. A class action will allow those similarly situated to litigate their claims in the most efficient and economical manner for the parties and the judiciary. Plaintiffs are unaware of any difficulties likely to be encountered in this action that would preclude its maintenance as a class action.

## COUNT 1
### Failure to Pay Minimum Wage under the FLSA
### 29 U.S.C. § 206(a)(1)(C)

67. Plaintiffs incorporate by reference every allegation contained above.

68. Plaintiffs bring this cause of action on behalf of themselves and the FLSA Class.

69. The FLSA requires that employees be paid a minimum wage of $7.25 per hour. *See* 29 U.S.C. § 206(a)(1)(C).

70. Defendants are employers required to comply with the FLSA's minimum wage mandate, and Plaintiffs and other FLSA Class members are employees entitled to the mandate's protections.

71. Compliance with the FLSA minimum wage mandate is measured on a workweek basis.[6]

---

[6] *See* 29 C.F.R. § 776.4(a) ("The workweek is to be taken as the standard in determining the applicability of the [FLSA]."); *Martin v. United States*, 117 Fed. Cl. 611, 623 (Fed. Cl. 2014) ("an overwhelming majority [of courts] have interpreted the FLSA to require a 'workweek' standard for the calculation of minimum wages due"); *Morgan v. Speak Easy, LLC*, 625 F. Supp. 2d 632, 651 (N.D. Ill. 2007) ("minimum wage is to be calculated on a workweek basis"); *Rogers v. Savings First Mortgage, LLC*, 362 F. Supp. 2d 624, 631 (D. Md. 2005) ("in order to meet the requirements of [the FLSA's minimum wage provisions], an employee compensated wholly or in part on a commission basis must be paid an amount not less than the statutory minimum wage for all hours worked in each workweek").

Case 1:24-cv-00568-LCB-JLW   Document 1   Filed 07/10/24   Page 28 of 36

72.     In determining whether an employee's weekly pay satisfies the FLSA's minimum wage mandate, the weekly pay amount is limited to compensation that is paid "finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. As such, the weekly pay amount must be reduced to account for an employee's out-of-pocket expenditures that primarily benefited the employer.[7]

73.     During some weeks, Defendants have willfully violated the FLSA's minimum wage mandate by paying Plaintiffs and other collective members compensation that amounts to under $7.25/hour after reductions for work-related deductions and expenditures.

74.     By reason of Defendants' intentional, willful, and unlawful acts, Plaintiffs and the FLSA Class have suffered damages and have incurred costs and reasonable attorneys' fees.

75.     Plaintiffs and the FLSA Class are thus entitled to, and hereby seek, recovery of all unpaid minimum wages, plus interest, liquidated damages, penalties, costs and attorneys' fees as provided by the FLSA.

## <u>COUNT 2</u>
### Failure to Pay Overtime under the FLSA
### 29 U.S.C. § 207(a)(1)

76.     Plaintiffs incorporate by reference every allegation contained above.

---

[7] *See Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1235-37 (4th Cir. 2002); *see, e.g.*, 29 C.F.R. § 531.35 ("For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act."); *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 705 (E.D.N.C. 2009) (in determining minimum wage compliance, weekly pay must be reduced to account for migrant workers' out-of-pocket transportation and border crossing expenses).

Case 1:24-cv-00568-LCB-JLW   Document 1   Filed 07/10/24   Page 29 of 36

77.     Plaintiffs bring this cause of action on behalf of themselves and the FLSA Class.

78.     The FLSA (Section 207(a)(1)) requires overtime pay at a rate not less than one and one-half times an employee's regular rate for work over forty hours in a week.

79.     Defendants' Distributors, including Plaintiffs, regularly worked (and continue to work) between 50 and 70 hours per week in accord with Defendants' mandated schedule. Yet Defendants never paid Plaintiffs or any member of the FLSA Class any overtime pay.

80.     Defendants know that these Distributors are improperly classified and that they work well over 40 hours per week, but intentionally and willfully fails to provide overtime premium pay.

81.     Plaintiffs and the FLSA Class are thus entitled to, and hereby seek, unpaid overtime for hours worked in excess of forty in a week, plus interest, liquidated damages, penalties, costs and attorney's fees as provided by the FLSA.

<h3 style="text-align:center;"><u>COUNT 3</u><br>Violation of the NCWHA<br>N.C. Gen. Stat. §§ 95-25.1, <em>et seq.</em></h3>

82.     Plaintiffs incorporate by reference every allegation contained above.

83.     Plaintiffs bring this cause of action on behalf of themselves and the North Carolina Class.

84.     It is unlawful under North Carolina law for an employer to require or permit an employee to work without paying compensation for all hours worked.

85.     It is unlawful under North Carolina law for an employer to require or permit a non-exempt employee to work in excess of 40 hours per week without paying overtime.

86.     It is unlawful under North Carolina law for an employer to make deductions from employee wages except for "cash shortages, inventory shortages, or loss or damage to an employer's property" but these deductions are only allowed after giving the employee written notice of the amount to be deducted.

87.     The position of Distributor does not meet the standards for exemption under the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.14.

88.     Defendants, through their policies and practices described above, willfully violated the NCWHA throughout the NCWHA Class Period, and continuing through the present, as follows:

    a.      By failing to pay Plaintiffs and the North Carolina Class the minimum wage required by NCWHA, in violation of N.C. Gen. Stat. § 95-25.3;

    b.      By failing to pay Plaintiffs and the North Carolina Class their promised and earned wages for all hours worked, in violation of N.C. Gen. Stat. § 95-25.6;

    c.      By failing to pay Plaintiffs and the North Carolina Class overtime pay, in violation of N.C. Gen. Stat. § 95-25.4;

    d.      By making unlawful deductions from wages, in violation of N.C. Gen. Stat. § 95-25.8;

    e.      By failing to make, keep, and preserve accurate time records with respect to Plaintiffs and the North Carolina Class sufficient to

determine their wages and hours, in violation of N.C. Gen. Stat. § 95-25.15;

f.      By failing to provide lawful notice to Plaintiffs and the North Carolina Class members of their policies and practices or any change in their policies and practices concerning compensation, in violation of N.C. Gen. Stat. § 95-25.13; and

g.      By other practices in violation of the NCWHA.

89.     Defendants' actions described above constitute continuing willful violations of the NCWHA, N.C. Gen Stat. §§ 95-25.1, *et seq.*

90.     As set forth above, Plaintiffs and other members of the North Carolina Class have sustained losses in compensation as a proximate result of Defendants' violations of the NCWHA. Accordingly, Plaintiffs, on behalf of themselves and the North Carolina Class members, seek damages in the amount of their unpaid earned compensation, plus liquidated damages, as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22.

91.     Plaintiffs, on behalf of themselves and the North Carolina Class members, seek recovery of their attorneys' fees and costs, as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22.

## COUNT 4
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1**
**(In the Alternative to Counts 1-3)**

92.     Plaintiffs incorporate by reference every allegation contained above.

93. Plaintiffs bring this cause of action on behalf of themselves and the North Carolina Class.

94. The actions and conduct of Defendants, as set forth herein, constitute unfair and deceptive acts or practices, in or affecting commerce, in violation of N.C. Gen. Stat. § 75-1.1.

95. Defendants committed acts that were unfair in that Defendants intentionally failed to pay Plaintiffs and the Class all earned wages, as required under applicable state and federal law and the Distributor Agreements entered into by Defendants and the Class.

96. Defendants' acts had the tendency to deceive Plaintiffs and the Class in that they reasonably relied upon Defendants' classification of Plaintiffs and the Class as independent contracts, when they were, in fact, employees of Defendants.

97. Defendants' acts further had the tendency to deceive Plaintiffs and the Class in that Plaintiffs reasonably relied upon Defendants' statements in the Distributor Agreements that they would be the exclusive Distributors to the respective retail outlets in their respective territories and would receive a commission for products distributed to those outlets.

98. Defendants' actions also give them undue advantage over their competitors as their competitors must face the costs of properly classifying equivalent workers as employees and providing those employees with wages and protections owed under State and federal law, as well as contractually.

CLASS ACTION COMPLAINT

99.     Defendants' misclassification of Plaintiffs and the Class as independent contractors, and the resulting failure to provide statutory and contractually owed wages and protections, are acts in and/or affecting commerce.

100.    Defendants' acts proximately caused Plaintiffs' and the Class's damages alleged herein, including but not limited to Plaintiffs' damages for wages owed and payments owed for minimum wages and overtime.

101.    Defendants' unlawful, unfair, unethical, fraudulent, and deceptive business practices violated Chapter 75 of the North Carolina General Statutes.

102.    Accordingly, Plaintiffs and the Class seek all statutory remedies to which they are entitled under N.C. Gen. Stat. § 75-1.1, including, but not limited to, injunctive relief, compensatory damages, a multiplier to be added to those damages, prejudgment interest and attorneys' fees.

## **<u>PRAYER FOR RELIEF</u>**

Plaintiffs pray for judgment as follows:

1.      Designation of this action as a collective action on behalf of the members of the FLSA Class and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the FLSA Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in tis action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b), and tolling of the statute of limitations;

2.	Certification of Plaintiffs' North Carolina state law claims as a Class Action pursuant to Fed. R. Civ. P. 23 and prompt issuance of notice to class member pursuant to Rule 23(c)(2);

3.	An award of regular and overtime compensation due under the FLSA and North Carolina law;

4.	An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay regular and overtime compensation pursuant to the FLSA (*e.g.*, 29 U.S.C. § 216);

5.	An Order requiring Defendants to compensate Plaintiffs and the Class for the reasonable value of benefits Plaintiffs and the Class provided to Defendants;

6.	Payment of any penalties or other amounts under any applicable laws, statute or regulations, including but not limited to liquidated damages;

7.	Judgment in favor of each Class member for damages suffered as a result of the conduct alleged herein, to include pre-judgment and post-judgment interest;

8.	An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

9.	For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury on all issues so triable.

Respectfully submitted,

Dated: July 10, 2024

**LAW OFFICES OF JAMES SCOTT FARRIN**

By:     */s/ Christopher R. Bagley*
Gary W. Jackson (NC SBN 13976)
Christopher Bagley (NC SBN 50567)
555 South Mangum Street, Suite 800
Durham, North Carolina 27701
Tel: (919) 883-4813
Fax: (880) 716-7881
Email: gjackson@farrin.com
Email: cbagley@farrin.com

**NICHOLAS & TOMASELVIC, LLP**
Craig M. Nicholas (CA SBN 178444)*
Alex Tomasevic (CA SBN 245598)*
Shaun Markley (CA SBN 291785)*
Jordan Belcastro (CA SBN 339570)*
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org
Email: smarkley@nicholaslaw.org
Email: jbelcastro@nicholaslaw.org

*Special Appearances to be Entered*

Attorneys for Plaintiffs CARL DUNST
and JAMEY SMITH